```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------x
RANUJOY D. PANDIT and DEBORA A.
PANDIT, individually and on behalf
of others similarly situated,

                Plaintiffs,           MEMORANDUM & ORDER
                                      11-CV-3935(JS)(GRB)
     -against-

SAXON MORTGAGE SERVICES,
INC.,

                Defendant.
--------------------------------x
APPEARANCES
For Plaintiffs:    Gail F. Schlanger, Esq.
                   Kenneth Brian Fromson, Esq.
                   Steven Lim, Esq.
                   Finkelstein & Partners LLP
                   1279 Route 300
                   P.O. Box 1111
                   Newburgh, NY 12551

                   Krishnan Shanker Chittur, Esq.
                   Chittur & Associates, P.C.
                   286 Madison Avenue, Suite 1100
                   New York, NY 10017

                   Keith Altman, Esq.
                   The Law Office of Keith Altman
                   32250 Calle Avella
                   Temecula, CA 92592

For Defendant:     Jason R. Scherr, Esq.
                   Bingham McCutchen LLP
                   2020 K Street, N.W., 10th Floor
                   Washington, DC 20006

                   Jeanette Viggiano Torti, Esq.
                   Bingham McCutchen LLP
                   399 Park Avenue, 24th Floor
                   New York, NY 10022
```

SEYBERT, District Judge:

Plaintiffs Ranujoy and Debora Pandit ("Plaintiffs") sued Defendant Saxon Mortgage Services, Inc. ("Saxon" or "Defendant") in a case that arises out of Saxon's alleged promise to modify Plaintiffs' home mortgage loan as a part of a program aimed at stemming foreclosures during the recent financial crisis. Pending before the Court is Defendant's motion to dismiss (Docket Entry 6); for the reasons that follow, this motion is GRANTED IN PART and DENIED IN PART.

## BACKGROUND

In very general terms, the federal Home Affordable Modification Program ("HAMP") is a program that was conceived during the financial crisis as a part of the broader Troubled Asset Relief Program. Under HAMP, certain mortgage lenders and servicers contracted with the federal government to modify qualified borrowers' home loan mortgages to reduce borrowers' monthly mortgage payments. Participating lenders and servicers, including Defendant, signed "Servicer Participation Agreements" ("SPAs"). Broadly speaking, the SPAs required lenders and servicers to identify loans in their portfolios that may be subject to permanent modification; collect financial and other information from borrowers to evaluate their eligibility; offer temporary plans whereby borrowers pay reduced monthly payments for three months ("Trial Period Plans" or "TPPs"); offer

permanent modifications for borrowers who successfully complete their Trial Period Plans; and notify borrowers who applied for modifications in writing whether they were found eligible for relief. (Compl. ¶¶ 5-8.)

Plaintiffs own a home in Westbury, New York. Their mortgage is owned by the Bank of New York and serviced by Defendant. By 2008, Plaintiffs were having difficulty making mortgage payments. (Id. ¶¶ 66-68.)

Plaintiffs applied for HAMP relief in October 2008. After months of delays and inconsistent responses, Defendant offered Plaintiffs a TPP in May 2009. (Id. ¶ 69.) Its offer letter provided, in part: "If you qualify under the federal government's Home Affordable Modification Program and comply with the terms of the Trial Period Plan, we will modify your mortgage loan and you can avoid future foreclosure." (Id. ¶ 70.) As is relevant here, the TPP itself contained the following language:

> If I am in compliance with this Trial Period Plan (the "Plan") and my representations in Section 1 continue to be true in all material respects, then the Lender will provide me with a Home Affordable Modification Agreement ("Modification Agreement") as set forth in Section 3, that would amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage.

(Def. Ex. 7, Pls. TPP, at 1.)  The TPP provided that Plaintiffs would make three reduced monthly mortgage payments and that this monthly amount was "an estimate of the payment that will be required under the modified loan terms, which will be finalized in accordance with Section 3, below."  (Id. § 2.)

The TPP also stated that:

> F. If prior to the Modification Effective Date, (i) the Lender does not provide me a fully executed copy of this Plan and the Modification Agreement; (ii) I have not made the Trial Period payments required under Section 2 of this Plan; or (iii) the Lender determines that my representations in Section 1 are no longer true and correct, the Loan Documents will not be modified and this Plan will terminate.  In this event, the Lender will have all of the rights and remedies provided by the Loan Documents, and any payment I make under this Plan shall be applied to amounts I owe under the Loan Documents and shall not be refunded to me; and
>
> G. I understand that the Plan is not a modification of the Loan Documents and that the Loan Documents will not be modified unless and until (i) I meet all the conditions required for modification; (ii) I receive a fully executed copy of a Modification Agreement; and (iii) the Modification Effective Date has passed.  I further understand and agree that the Lender will not be obligated or bound to make any modification of the Loan Documents if I fail to meet any one of the requirements under this Plan.  I understand and agree that the Lender will not be obligated or bound to make any modification of the Loan Documents or to execute the Modification Agreement if the Lender has not received an acceptable title endorsement and/or subrogation

4

>  agreements from other lien holders, as
> necessary, to ensure that the modified
> mortgage Loan retains its first lien
> position and is fully enforceable.

(Id. § 2.F, G.)  The TPP continued:

> The Modification. I understand that once
> Lender is able to determine the final
> amounts of unpaid interest and any other
> delinquent amounts (except late charges) to
> be added to my loan balance and after
> deducting from my loan balance any remaining
> money held at the end of the Trial Period
> under Section 2.D above, the Lender will
> determine the new payment amount. If I
> comply with the requirements in Section 2
> and my representations in Section 1 continue
> to be true in all material respects, the
> Lender will send me a Modification Agreement
> by the Lender and me, this Plan shall
> terminate and the Loan Documents, as
> modified by the Modification Agreement,
> shall govern the terms between the Lender
> and me for the remaining term of the Loan.

(Id. § 3.)

Plaintiffs returned the TPP, provided the required information, and made the reduced monthly payments called for under the plan. (Compl. ¶ 71.) They did not receive a permanent loan agreement, though, and when they asked Defendant about the status of their modification, they were told to resubmit basically the same information that they had already provided. (Id. ¶¶ 72-73.) They resubmitted the necessary documents at least three times. (Id. ¶ 73.) In the meantime, they continued to make mortgage payments (at the reduced, trial-period rate) (see id. ¶ 74), and, on August 30, 2010, Defendant

finally told Plaintiffs that their application for a permanent modification had been denied (id. ¶ 75).

Plaintiffs purport to assert claims on their own and on behalf of three classes of plaintiffs. The "Contract Class" is defined as:

> All persons whose home mortgage loans were or are serviced by Saxon, and who (i) entered into a [TPP] with Saxon; (ii) made all payments required by their [TPP]; but (iii) were denied a loan modification as represented in the [TPP].

(Id. ¶ 81.) The "New York Class" is defined as: "All persons whose home mortgage loans were serviced by Saxon and who defaulted on their loans at any time from April 13, 2009." (Id.) The "ECOA Class" is defined as:

> All natural persons who on any date on or after April 17, 2009, (a) with regard to a mortgage loan secured by their personal residence and serviced by Saxon which was not delinquent or in default; (b) were denied a loan modification under the Making Home Affordable Program or HAMP by Saxon; and (c) did not receive within 30 days of that denial, a written notice from Saxon that provided a statement of reasons for the denial and additional statutory disclosures required by [the Equal Credit Opportunities Act].

(Id.)

## DISCUSSION

Plaintiffs' Complaint asserts the following claims: (1) for breach of the SPA; (2) for breach of the TPP; (3)

6

promissory estoppel; (4) for deceptive business practices under New York's General Business Law § 349; and (5) for violating the Equal Credit Opportunities Act ("ECOA"). The Court recites the applicable standard of review and then turns to Plaintiffs' claims in order.

I. Standard of Review

To survive a Rule 12(b)(6) motion, a plaintiff must plead sufficient factual allegations in the complaint to "state a claim [for] relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929, 949 (2007). The complaint does not need "detailed factual allegations," but it demands "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id. at 555. In addition, the facts pleaded in the complaint "must be enough to raise a right to relief above the speculative level." Id. Determining whether a plaintiff has met his burden is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Harris v. Mills, 572 F.3d 66, 72 (2d Cir. 2009). However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009).

II. Analysis

Defendant's motion is granted in part and denied in part.

A. Breach of the SPA

Plaintiffs' claim under the SPA fails as a matter of law because they do not have standing to sue on the SPA. This Court recently considered this issue and sided with the overwhelming majority of courts that have found that borrowers are not intended third-party beneficiaries of SPAs and thus may not sue to enforce the agreements' terms. Picini v. Chase Home Fin. L.L.C., --- F. Supp. 2d ----, 2012 WL 580255, at *4-5 (Feb. 16, 2012) (Seybert, J.). Plaintiffs' SPA claim (Compl. ¶¶ 93-99) is therefore dismissed.

B. Breach of the TPP

Plaintiffs' claim under the TPP merits more discussion. To put it plainly, the TPP is a poorly-drafted document, see, e.g., Polk v. Countrywide Fin. Corp., No. 12-CV-1064, 2012 WL 2952389, at *4 (E.D. Mich. July 19, 2012) (TPP "may not be a model of clarity"); Darcy v. CitiFinancial, Inc., No. 10-CV-0848, 2011 WL 3758805, at *6 (W.D. Mich. Aug. 25, 2011) (TPP was "far from clear"), and unsurprisingly, it has been the subject of much litigation. Courts, like the parties in this case, disagree whether the TPP obligates lenders to permanently modify loans for borrowers who make timely trial-

period payments (Plaintiffs' view) or is simply a step in the application process toward a permanent modification (Defendant's view). See, e.g., Darcy, 2011 WL 3758805, at *6 n.1 (finding that plaintiffs stated a claim for breach of a TPP and distinguishing cases that reached the opposite conclusion). Having reviewed the TPP in this case and considered the parties' arguments, this Court concludes that the TPP was a step in the application process and, to the extent that Defendant did not return an executed TPP to Plaintiffs or provide them with a permanent loan modification, the TPP itself did not bind Defendant to provide a permanent modification.

The Court reaches this conclusion principally because it must interpret each part of the TPP with an eye toward the entire document. See Beal Sav. Bank v. Sommer, 8 N.Y.3d 318, 324, 865 N.E.2d 1210, 1213-1214, 834 N.Y.S.2d 44, 47-48 (2007). In New York, as elsewhere, courts "should construe the agreement[] so as to give full meaning and effect to the material provisions." Excess Ins. Co. Ltd. v. Factory Mut. Ins., 3 N.Y.3d 577, 582, 822 N.E.2d 768, 770-771, 789 N.Y.S.2d 461, 463-64 (2004). "A reading of the contract should not render any portion meaningless," Beal, 865 N.E.2d at 1213-14, and every part of a contract should "be interpreted with reference to the whole," id. (quoting Matter of Westmoreland

Coal Co. v. Entech, Inc., 100 N.Y.2d 352, 358, 763 N.Y.S.2d 525, 794 N.E.2d 667 (2003)).

There is contract language that, read in isolation, supports Plaintiffs' view that the TPP bound Defendant to provide them with a permanent modification. In Section 3, the TPP states that "[i]f I [the borrower] comply with the requirements in Section 2 [i.e., the trial period payments] and my representations in Section 1 continue to be true in all material respects, the Lender <u>will send</u> me a Modification Agreement for my signature which <u>will modify</u> my Loan Documents as necessary to reflect this new payment amount and waive any unpaid late charges accrued to date." (Def. Ex. 7 § 3 (emphasis added).) Similarly, the very first sentence of the TPP provides that "If I am in compliance with this Trial Period Plan (the "Plan") and my representations in Section 1 continue to be true in all material respects, then the Lender will provide me with a Home Affordable Modification Agreement ("Modification Agreement"), as set forth in Section 3, that would amend and supplement (1) the Mortgage . . . and (2) the Note . . . ." (Id. at 1.) These provisions suggest that as long as Plaintiffs made their trial payments and provided accurate information about their financial condition, they would be entitled to a permanent loan modification with monthly payments at or near the level of their trial period payments. (See, e.g., id. § 2 ("The

10

Trial Period Payment is an estimate of the payment that will be required under the modified loan terms, which will be finalized in accordance with Section 3, below.").)

But these clauses cannot be read apart from other language in the document indicating that the TPP was but one step on the road toward a permanent modification. The second paragraph explained that Defendant still had to evaluate Plaintiffs' eligibility for a permanent modification:

> If I have not already done so, I am providing confirmation of the reasons I cannot afford my mortgage payment and documents to permit verification of all of my income . . . to determine ***whether I qualify*** for the offer described in this Plan (the "Offer"). I understand that after I sign and return two copies of this Plan to the Lender, the Lender will send me a copy of this Plain ***if I qualify*** for the Offer or will send me a written notice that I do not qualify for the Offer. ***This Plan will not take effect unless and until both I and the Lender sign it and Lender provides me with a copy of this Plan with the Lender's signature***.

(Id. at 1 (emphasis added).) Additionally, as noted above, the TPP cautioned borrowers that their loan would not be modified unless, prior to the Modification Effective Date, the Lender provided them with fully executed copies of both the TPP and a Modification Agreement. (Id. § 2.F.) Defendant never provided Plaintiffs with executed copies of either document. Finally,

11

and perhaps most important, the TPP was explicit that it was not a permanent modification. (Id. § 2.G.)

On the latter point, courts, including a court in this Circuit, have relied on this language in rejecting breach-of-TPP claims. See Costigan v. CitiMortgage, Inc., No. 10-CV-8776, 2011 WL 3370397, at *6-7 (S.D.N.Y. Aug. 2, 2011); Thomas v. JPMorgan Chase & Co., 811 F. Supp. 2d 781, 796 (S.D.N.Y. 2011). And, in Picini, this Court indicated that it found this rationale persuasive. 2012 WL 580255, at *6. It still does. Plaintiffs' breach of contract claim must be dismissed because the TPP--however poorly drafted certain portions may be--does not obligate Defendant to permanently modify Plaintiffs' loan. See, e.g., Polk, 2012 WL 2952389, at *4 ("The Trial Period Plan may not be a model of clarity, but it does not obligate Defendant to permanently modify Plaintiff's loan without further review.").

Further, as the TPP was not a contract between Plaintiffs and Defendant, Plaintiffs' claim that Defendant breached the TPP's implied covenant of good faith and fair dealing also fails. See Herman v. Green, 234 F.3d 1262 2000 WL 1591272, at *2 (2d Cir. 2000) (unpublished); accord Costigan, 2011 WL 3370397, at *8 (dismissing good faith and fair dealing claim allegedly arising out of the SPA where plaintiff could not enforce the SPA).

C. <u>Promissory Estoppel</u>

Plaintiffs' promissory estoppel claim must also be dismissed. As noted above, the TPP was not a promise to permanently modify Plaintiffs' loan. <u>See</u> <u>Costigan</u>, 2011 WL 3370397, at *7 (dismissing promissory estoppel claim predicated on a TPP); <u>see also</u> <u>Kaye v. Grossman</u>, 202 F.3d 611, 615 (2d Cir. 2000) (Sotomayor, J.) (noting that under New York law, promissory estoppel requires a "clear and unambiguous promise," "reasonable and foreseeable reliance on that promise;" and an injury). In their opposition, Plaintiffs argue that this claim is premised not only on a promise to modify Plaintiffs' loan, but also on a promise that Plaintiffs' home would not be foreclosed on while the TPP was in effect. Plaintiffs have not been foreclosed on, though, and it's not clear whether or how Plaintiffs were injured by their alleged reliance on such a promise. If Plaintiffs want to pursue this theory, they must re-plead this claim.

D. <u>New York's Deceptive Practices Act</u>

Plaintiffs' claim under Section 349 of New York's General Business Law (the "Deceptive Practices Act" or the "DPA") may go forward. To state a claim under the DPA, "a plaintiff must allege that '(1) the act or practice was consumer-oriented; (2) the act or practice was misleading in a material respect; and (3) the plaintiff was injured as a

result.'" Costigan, 2011 WL 3370397, at *5 (quoting Spagnola v. Chubb Corp., 574 F.3d 64, 74 (2d Cir. 2009)). Defendant argues that Plaintiffs have not alleged a consumer-oriented practice or materially misleading act. (Def. Br. 20-12.)

At this stage of the case, the Court concludes that Plaintiffs have adequately alleged a consumer-oriented practice sufficient to state a DPA claim. Plaintiffs allege that Defendant routinely asks homeowners to resubmit financial information on pretextual grounds (Compl. ¶ 51); misleads homeowners over the phone (id. ¶ 52); and ignores completed loan modifications (id. ¶ 53) in what is fairly read to be a series of steps designed to string along loan modification applicants. Plaintiffs further allege that Defendant "routinely" violates its TPP obligations (id. at ¶ 59) and that it refused to permanently modify loans to Plaintiffs and others notwithstanding their successful completion of the Trial Period (id. ¶ 119.b). On a motion to dismiss, these facts sufficiently allege a consumer practice. See Skibinsky v. State Farm Fire & Cas. Co., 6 A.D.3d 975, 976, 775 N.Y.S.2d 200, 201 (3d Dep't 2004) (plaintiff who alleged a "recurring pattern" of deceptive insurance sales sufficiently pled a DPA violation); see also Riordan v. Nationwide Mut. Fire Ins. Co., 977 F.2d 47, 53 (2d Cir. 1992) (affirming jury verdict where plaintiffs "presented ample evidence to prove that Nationwide engaged in similar

deceptive settlement practices against other policyholders"); Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A., 85 N.Y.2d 20, 26, 647 N.E.2d 741, 745, 623 N.Y.S.2d 529, 533 (1995) (finding that alleged practice was consumer oriented in part because it was "not unique to these two parties, nor were . . . private in nature or a single shot transaction" (internal quotation marks omitted)); cf. Infostar Inc. v. Worcester Ins. Co., 924 F. Supp. 25, 29 (S.D.N.Y. 1996) ("In a case like this one, however, in which the complained-of acts concerned only the parties, it is difficult to see how defendants' acts could have ramifications for the public at large <u>unless their conduct was consistent with a policy or practice applicable to other policyholders</u>." (emphasis added)); N.Y. Workers' Compensation Bd. v. 26-28 Maple Avenue, Inc., 80 A.D.3d 1135, 1136-37, 915 N.Y.S.2d 744 (3d Dep't 2011).

Plaintiffs have also alleged a materially misleading practice, namely that Defendant took steps to delay deciding on applicants' permanent loan modifications until well after their three-month Trial Periods had run. (E.g., Compl. ¶¶ 51-53, 75). It continued to accept Trial Period payments after three months (for nearly another year, in Plaintiffs' case) despite TPP language suggesting that Defendant would, at the end of three months, either grant a permanent modification or state its reasons for denying one. (Id. ¶ 75; Def. Ex. 7, preamble &

§ 2.) Plaintiffs further allege that this scheme lulled them into not pursuing other options for saving their home. (Id. ¶ 65.) The Court notes again that Defendant was aided in this alleged deception by TPP language that other courts have found confusing, see Polk, 2012 WL 2952389, at *4, or outright misleading, Thomas, 811 F. Supp. 2d at 796. In short, Plaintiffs have sufficiently alleged that Defendant's policy of delay and obfuscation misled Plaintiffs as to the status of their loan modification application. See Ural v. Encompass Ins. Co. of Am., 97 A.D.3d 562, 564-65, 948 N.Y.S.2d 621, 625 (2d Dep't 2012) (plaintiffs who alleged a "general practice of inordinately delaying the settlement of insurance claims against policyholders" stated a DPA claim).

E. The Equal Credit Opportunities Act

Finally, Plaintiffs allege that Defendant violated the ECOA when it denied what amounted to Plaintiffs' application for credit without providing them a written "adverse action" notice within thirty days of its decision. (Compl. ¶¶ 125-30.) "The ECOA requires a creditor that takes 'adverse action' on a consumer credit application to provide a 'statement of reasons' for the adverse action." Bourdelais v. J.P. Morgan Chase, No. 10-CV-0670, 2011 WL 1306311, at *8 (E.D. Va. Apr. 1, 2011) (citing 15 U.S.C. § 1691(d)). Under the ECOA,

16

> "[A]dverse action" means a denial or revocation of credit, a change in the terms of an existing credit arrangement, or a refusal to grant credit in substantially the amount or on substantially the terms requested. ***Such term does not include a refusal to extend additional credit under an existing credit arrangement where the applicant is delinquent or otherwise in default***, or where such additional credit would exceed a previously established credit limit.

15 U.S.C. § 1691(d)(6) (emphasis added). Defendant argues that because Plaintiffs were making reduced mortgage payments during the trial period, they were "delinquent or otherwise in default" on their mortgage and that its "refusal to extend additional credit" in the form of a loan modification falls within the exception set forth above. See id.

Courts have disagreed whether a mortgage borrower who makes timely Trial Period payments is in default on the overarching mortgage loan. Compare Bourdelais, 2011 WL 1306311, at *8 (plaintiff stated an ECOA claim where her complaint alleged that she made all required mortgage payments) with Eichholz v. Wells Fargo Bank, NA, No. 10-CV-13622, 2011 WL 5375375, at *9 (E.D. Mich. Nov. 7, 2011) and Davis v. Citimortgage, Inc., No. 10-12136, 2011 WL 891209, at *3 (E.D. Mich. Mar. 11, 2011) (timely Trial Period payments did not mean plaintiff was not in default on her mortgage because "the Trial

17

Plan clearly stated that it did not modify the existing credit arrangement").

This Court concludes that a denial of a HAMP loan modification does not trigger the ECOA's adverse action explanation requirement because the TPP did not alter the terms of Plaintiffs' underlying loan obligations. The TPP was explicit:

> That all terms and provisions of the Loan Documents remain in full force and effect; nothing in this Plan shall be understood or construed to be a satisfaction or release in whole or in part of the obligations contained in the Loan Documents. The Lender and I will be bound by, and will comply with, all of the terms and provisions of the Loan Documents.

(Def. Ex. 7 § 4.D) Thus, in making reduced payments during the Trial Period, Plaintiffs were in default on their mortgage for the purposes of the ECOA. See Eichholz, 2011 WL 5375375, at *9; Davis, 2011 WL 891209, at *3; see also Ortega v. Wells Fargo Bank, N.A., No. 11-CV-1734, 2012 WL 275055, at *5 (N.D. Ohio Jan. 31, 2012) ("The TPA allows a mortgagor to make reduced payments for a three-month trial period; it does not modify the underlying mortgage and its obligations. Instead, the mortgagor incurs a voluntary and short-term default in exchange for an

evaluation that may or may not result in a permanent modification.")[1] [2]

[Remainder of Page Intentionally Blank]

---

[1] At least one court has found that the ECOA places a dual obligation on lenders when they deny applications for permanent loan modifications under HAMP: an obligation to provide timely notice of the decision and an obligation to explain the reasons for an adverse action. Ortega, 2012 WL 275055, at *4. The "delinquent or default" exception arguably goes only to the lender's obligation to provide the reasons for its adverse action and would not excuse untimely notice of its decision. Id. Plaintiffs confine their claim to Defendant's alleged failure to provide an explanation for the adverse action, so the Court need not resolve this issue here.

[2] In a footnote, Plaintiffs also argue that their application for a permanent modification sought simply a "change in the terms of an existing credit arrangement" and was not a request for "additional credit under an existing credit arrangement." See 15 U.S.C. § 1691(d)(6). Thus, they argue, the "delinquent or default" exception in the second sentence of 15 U.S.C. § 1691(d)(6), which addresses applications for "additional credit," does not apply to their case. (See Pls. Opp. 31 n. 23.) The Court is not persuaded. Rather, it reads "additional credit under an existing credit arrangement" as one possible type of "change in the terms of an existing credit arrangement"--the type for which applicants who are already delinquent on their existing arrangements apply.

CONCLUSION

For the foregoing reasons, Defendant's motion is GRANTED IN PART and DENIED IN PART. Plaintiffs' breach of contract claims (of the SPA and the TPP) are dismissed, as is any claim for breach of the covenant of good faith and fair dealing arising from these alleged agreements. Their promissory estoppel claim is dismissed with leave to re-plead the portion of their claim concerning Defendant's alleged promise not to foreclose on Plaintiffs' home. The ECOA claim is dismissed.

Plaintiffs' DPA claim may proceed.

SO ORDERED.

/s/ JOANNA SEYBERT_____
Joanna Seybert, U.S.D.J.

Dated:   September 17, 2012
         Central Islip, New York